ROBERT J. O'CONNOR
JOSEPH E. HOREY
O'CONNOR BERMAN HOREY & BANES, LLC
201 Marianas Business Plaza
1 Nauru Loop, Susupe, Saipan, CNMI
Mail: PO Box 501969 Saipan CNMI 96950
Phone: 234-5684 Fax: 234-5683
E-mail: cnmi@pacificlawyers.law

VICTORINO DLG. TORRES
MATTHEW J. HOLLEY
TORRES BROTHERS, LLC
1st Floor, Ben & Bibang Bldg.
Middle Road, Garapan, Saipan, CNMI
Mail: PO Box 501856 Saipan MP 96950
Phone: 233-5503/04/06  Fax: 233-5510
E-mail: pacificlaw@hotmail.com

*Attorneys for Plaintiffs*

FILED
Clerk
District Court

APR - 5 2018

for the Northern Mariana Islands
By_____
(Deputy Clerk)

IN THE DISTRICT COURT
FOR THE NORTHERN MARIANA ISLANDS

CV 18- 0011

| | |
|---|---|
| DREAM PACIFIC AVIATION SERVICES, HONG KONG, LTD.; EVELEN U.S.A. CORPORATION, *dba* IMPRESSION TOUR; BRIGHT INVESTMENT, LLC, *dba* SAIPAN RESTAURANT; RIONDA COMPANY, LTD., *dba* NEW SHIN RESTAURANT; BW INTERNATIONAL, INC., *dba* BW CAR RENTAL; CUI XING, KONG FANJING, LI HUAKUN, LI XIUXIA, LIANG WEI, LUO FENG, MENG JIE, QIAN DONGYUAN, QIAN YUTIAN, SHI SONGZHEN, SONG GUANGSEN, WANG FANG, WANG MINGQIANG, WANG QIANDUO, WANG YAMING, WANG YELAN, YANG SHIPING, ZHANG GUIFENG, ZHANG LIN, ZHANG SHUANGLI, and ZHAO JINGJIAN, <br><br> Plaintiffs, <br><br> vs. <br><br> FRANK J. VISCONTI; NICOLAS FINAZZO; ANDREW LOTTER; TEM ENTERPRISES, INC., *dba* XTRA AIRWAYS; AERSALE, INC.; AERLINE HOLDINGS, LLC; CARLTON CONKLING; and JOHN DOES 1-10, <br><br> Defendants. | Civil Action No. 18-_____ <br><br><br><br> COMPLAINT |

**COME NOW** Plaintiffs, by and through counsel, and hereby complain against the Defendants, jointly and severally, as follows:

## NATURE OF THE ACTION

1. This is an action for damages arising from a scheme to defraud Plaintiffs in connection with a plan to bring vacationing tourists from China to Saipan via charter aircraft – a plan that Defendants pretended to participate in, but in fact deliberately sabotaged by failing to take the steps necessary for it to succeed, even as Defendants induced Plaintiffs to believe in, rely on, and/or invest in the continuing viability of the plan, all to Plaintiffs' injury as set forth herein.

2. As more fully alleged below, Defendants engaged in a fraudulent scheme to damage Plaintiffs through acts and omissions which violated federal laws and regulations, as well as the statutory and common law of the CNMI. Defendants knowingly and willfully conspired and agreed among themselves to carry out this fraudulent scheme, or, in the alternative, later joined the ongoing fraudulent scheme, and fully ratified its purpose and all past actions taken in its furtherance.

3. Various acts taken by Defendants herein were accomplished by or through the use of interstate and international telephone wires, and other instrumentalities of interstate and foreign commerce; and such acts have exerted, and will continue to exert, a substantial impact on the interstate and foreign commerce of the United States. Plaintiffs have been injured in an amount in excess of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

4. Plaintiffs are residents of Saipan, CNMI, and the People's Republic of China. Defendants, at all relevant times, have transacted business and otherwise have been found within the District of the Northern Mariana Islands for purposes of the jurisdiction of this Court, service of process and venue. Moreover, many of the acts and/or transactions which

are hereinafter alleged as constituting material aspects of the Defendants' violations and offenses occurred within or were directed toward the District of the Northern Mariana Islands.

**PARTIES**

**A. The Business Plaintiffs**

5.      Plaintiff Dream Pacific Aviation Services, Hong Kong, Ltd. (hereinafter "Dream Pacific") is a corporation organized and existing under the laws of the Hong Kong Special Administrative Region of the People's Republic of China, with its principal place of business in Shanghai.  Dream Pacific was established to arrange air transportation for tourists to fly round-trip from multiple locations in China to various international destinations, including Saipan.

6.      Plaintiff Evelen U.S.A. Corporation, *dba* Impression Tour, is a corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal place of business on Saipan.  Impression Tour was retained by Dream Pacific to assist it in providing for the accommodation and entertainment of the Chinese tourists whom Dream Pacific brought and intended to bring into Saipan in 2017 and 2018 via XTRA Airways.

7.      Plaintiff Bright Investment, LLC, *dba* Saipan Restaurant, is a limited liability company organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal place of business on Saipan.  Saipan Restaurant had agreements with Impression Tour to accommodate Chinese tourists being transported to Saipan by Dream Pacific via XTRA Airways in 2017 and 2018.

8.      Plaintiff Rionda Company, Ltd., *dba* New Shin Restaurant, is a corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands, with its principal place of business on Saipan.  New Shin Restaurant had agreements with Impression

3

Tour to accommodate Chinese tourists being transported to Saipan by Dream Pacific via XTRA Airways in 2017 and 2018.

9.      Plaintiff BW International, Inc., *dba* BW Car Rental, is a corporation organized and existing under the laws of the Commonwealth of the Northern Mariana Islands.  BW Car Rental had agreements with Impression Tour to accommodate Chinese tourists being transported to Saipan by Dream Pacific via XTRA Airways in 2017 and 2018.

10.      Dream Pacific, Impression Tour, Saipan Restaurant, New Shin Restaurant and BW Car Rental are hereinafter sometimes referred to collectively as the "Business Plaintiffs."

**B.  The Tourist Plaintiffs**

11.      The following Plaintiffs (hereinafter sometimes referred to collectively as the "Tourist Plaintiffs") are citizens and residents of the People's Republic of China: 1) Cui Xing; 2) Kong Fanjing; 3) Li Huakun; 4) Li Xiuxia; 5) Liang Wei; 6) Luo Feng; 7) Meng Jie; 8) Qian Dongyuan; 9) Qian Yutian; 10) Shi Songzhen; 11) Song Guangsen; 12) Wang Fang; 13) Wang Mingqiang; 14) Wang Qianduo; 15) Wang Yaming; 16) Wang Yelan; 17) Yang Shiping; 18) Zhang Guifeng; 9) Zhang Lin; 20) Zhang Shuangli; and 21) Zhao Jingjian.

12.      The following Tourist Plaintiffs (hereinafter the "Stranded Tourist Plaintiffs") traveled from China to Saipan via XTRA Airways prior to November 4, 2017, and were scheduled to return to China via XTRA Airways on or after that date, but instead were abandoned by XTRA on Saipan: 1) Li Xiuxia; 2) Luo Feng; 3) Meng Jie; 4) Shi Songzhen; 5) Song Guangsen; 6) Wang Fang; 7) Wang Mingqiang; 8); Wang Yaming; 9) Wang Yelan; 10) Zhang Lin; and 11) Zhao Jingjian.

13.      The following Plaintiffs (hereinafter the "Intending Tourist Plaintiffs") had booked and/or paid for flights on XTRA Airways charter flights from China to Saipan and back to China, which were scheduled for the time period between November 4, 2017, and December 10,

2017, but which never flew due to XTRA's abandonment of the Saipan routes: 1) Cui Xing; 2) Kong Fanjing; 3) Li Huakun; 4) Liang Wei; 5) Qian Dongyuan; 6) Qian Yutian; 7) Yang Shiping; 8) Wang Qianduo; 9) Zhang Guifeng; and 10) Zhang Shuangli.

## C.  The Defendants.

14.     Defendant Frank J. Visconti is a citizen and resident of the State of Florida who, at all times relevant to this action, was President and Chief Executive Officer of XTRA Airways. Defendant Visconti personally authorized, directed and actively participated in the fraudulent and wrongful conduct committed against Plaintiffs herein.

15.     Defendant Nicolas Finazzo is a citizen and resident of the State of Florida who, at all times relevant to this action, was a director of XTRA Airways and AerSale, Inc., Chief Executive Officer of AerSale, and a member of AerLine Holdings, LLC.  Defendant Finazzo personally authorized, directed and actively participated in the fraudulent and wrongful conduct committed against Plaintiffs herein.

16.     Defendant Andrew Lotter is, on information and belief, a citizen and resident of the State of Florida who, at all times relevant to this action, was Chief Operating Officer and Director of Operations for XTRA Airways.  Defendant Lotter personally authorized, directed and actively participated in the fraudulent and wrongful conduct committed against Plaintiffs herein.

17.     Defendant TEM Enterprises, Inc., d/b/a XTRA Airways, is a corporation organized and existing under the laws of the State of Nevada, with its principal place of business in Coral Gables, Florida.

18.     Defendant AerSale, Inc., is, on information and belief, a corporation organized and existing under the laws of the State of Florida, with its principal place of business in Coral Gables, Florida.  At all times pertinent to this action, AerSale has operated and controlled XTRA

Airways.  AerSale was the registered owner of the B-737-800 aircraft that XTRA Airways used for the Saipan/China flights described in this action.

19.     Defendant AerLine Holdings, LLC, is, on information and belief, a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in Coral Gables, Florida.  AerLine Holdings is the owner and parent corporation owner of XTRA Airways.

20.     Defendant Carlton Conkling is, on information and belief, a citizen and resident of the State of Texas.  At all times relevant to this action, he was employed as a pilot by XTRA Airways, and served as captain of several XTRA Airways flights between Saipan and China.  He was aware of, or willfully and culpably indifferent to, the fact that the aircraft used for such flights, including flights on which he acted as captain and pilot, was not adequate for its purposes, that it was systematically operated in violation of controlling aircraft safety rules and regulations, including but not limited to ETOPS regulations, and that such use was unsustainable over the long term, and would inevitably doom the Dream Pacific/XTRA Airways Saipan-China charter project if persisted in.  He nevertheless failed to advise Plaintiffs of this ongoing pattern of violations, or to take any steps to correct such violations or prevent them from recurring, but rather knowingly participated in and profited from them for so long as he was able, and, in so doing, endorsed, ratified and joined the conspiracy alleged against Plaintiffs herein.

21.     Various other corporations and individuals, named herein as Does 1 through 10, have participated as co-conspirators in the offenses charged herein and have engaged in conduct and made statements in furtherance thereof.  The true names and capacities, whether individual, corporate, associate, or otherwise, of the Defendants being named as Does 1 through 10, inclusive, are unknown to Plaintiffs at this time.  Plaintiffs will seek leave to amend this Complaint at such time as they become aware of the true names and capacities of Does 1 through

10, inclusive.  Plaintiffs are informed and believe, and on that basis allege, that each of the fictitiously named Defendants is responsible for the occurrences herein alleged, and that Plaintiffs' injuries and damages as alleged herein were proximately caused by those Defendants.

22.    Plaintiffs are informed and believe, and on that basis allege, that each Defendant, including each Defendant sued under a fictitious name, was the agent, servant, employee, successor, co-conspirator, alter ego, joint employer and/or integrated enterprise of each of the other Defendants, and at all relevant times acted within the scope of such relationship, within the knowledge and/or under the direction and control of the other Defendants, and pursuant to and in furtherance of the fraudulent scheme alleged herein, and is jointly obligated with the remaining Defendants, and each of them.  Each Defendant participated in, approved or ratified the unlawful acts and omissions of other Defendants complained of herein, and all of the acts and omissions complained of herein are attributable to all Defendants.  Whenever and wherever reference is made in this Complaint to any act by a Defendant or Defendants, such allegation and reference shall be deemed to mean the acts, and failures to act, of each Defendant acting individually, jointly and severally, including all Defendants sued under fictitious names.

23.    Defendants have combined and conspired for the purpose of financially benefiting themselves and other Defendants at the expense of and to the detriment of Plaintiffs.

## JURISDICTION AND VENUE

24.    This Court has original subject matter jurisdiction over this case pursuant to 48 U.S.C. § 1822 and 28 U.S.C. § 1332, based on diversity of citizenship.

23.    This Court also has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

24.     This Court also has original subject matter jurisdiction pursuant to 18 U.S.C. § 1964(c), which provides that any person injured in his business or property by reason of a violation of 18 U.S.C. § 1962 may sue therefor in any appropriate United States district court.

25.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) or (3) and 18 U.S.C. § 1965.

## DEMAND FOR JURY TRIAL

26.     Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial on all issues triable by a jury.

## FACTS

### A. Dream Pacific and XTRA Agree to a Plan for Charter Flights.

27.     In 2016 and 2017, Dream Pacific engaged in negotiations with XTRA Airways for XTRA to provide charter air services between Saipan and China for the purpose of transporting Chinese tourists visiting Saipan.  These negotiations took place via telephone and e-mail between points in the United States and points in China, as well as in person.

28.     Pursuant to these negotiations, Dream Pacific and XTRA entered into an Aircraft Charter Agreement on or about March 18, 2017.

29.     Dream Pacific entered into the Agreement in good faith, intending to perform, and expecting XTRA to do the same.

30.     In the Aircraft Charter Agreement, XTRA agreed to make one aircraft, with crew, available to Dream Pacific for charter flights according to the following schedule: three weekly flights Saipan and Nanjing; three weekly flights between Saipan and Tianjin; and one weekly flight between Saipan and Changsha.  XTRA guaranteed the availability of the plane and crew for a minimum of 230 hours per month, and Dream Pacific agreed to pay for the use of the plane for the same minimum number of hours, at an agreed rate, regardless of whether it was actually used for such hours, and regardless of the number of passengers on the flight.

8

31.    The Aircraft Charter Agreement required XTRA:

(1) to be fully authorized and licensed to operate the aircraft for all the purposes required by the Charter Agreement;

(2) to ensure that the aircraft were in serviceable condition, fit for the purpose intended, and fully equipped for the commercial airlines operations they undertook on behalf of Dream Pacific;

(3) to ensure that the aircraft were maintained and operated in accordance with the requirements of applicable aviation authorities;

(4) to provide duly licensed and approved flight crews;

(5) to be responsible for applying for and using commercially reasonable efforts to obtain any authorizations and permits needed from governmental authorities necessary for the performances of XTRA Airways' charter transportation services.

(6) to undertake all commercially reasonable efforts to return any of its involved aircraft to a serviceable condition should its aircraft become unserviceable;

(7) to provide a substitute aircraft in the event of cancellation, interruption or a delay beyond 48 hours of a charter flight as a result of mechanical considerations;

(8) to arrange and manage direct operating costs including ground handling, landing and airport charges, and deposits; and

(9) to refund to Dream Pacific charges for each cancelled flight.

32.    XTRA at all times represented that any of its aircraft used for charter operations under the Aircraft Charter Agreement would be safe, properly registered, adequately staffed, and would have all the permits, licenses, certifications and approvals necessary and required by all applicable governmental agencies to transport passengers between China and Saipan on the intended routes, including ETOPS certification.

33.    Pursuant to the Aircraft Charter Agreement, and in reliance on the promises and representations of Defendants, Dream Pacific deposited one million US dollars ($1,000,000.00) into an escrow account to secure aircraft availability.  The said sum of one million dollars was wired from China to XTRA Airways' bank account at the Wilmington Savings Fund Society, FSB, in Wilmington, Delaware, on or about March 31, 2017.

## B.  Defendants Conspire to Subvert the Agreement

34.     At some point after entering into the Aircraft Charter Agreement, but before charter flights commenced pursuant thereto, Defendant Visconti, Finazzo and Lotter determined that XTRA's contractual relationship with Dream Pacific under the Aircraft Charter Agreement was dissatisfactory and disadvantageous to XTRA, and therefore resolved and conspired together to terminate that relationship by fraudulent means.

35.     Pursuant to this scheme, Defendants Visconti, Finazzo and Lotter, directly or through witting or unwitting agents, encouraged and induced Dream Pacific to agree to an amendment to the Aircraft Charter Agreement, whereby the charter project would ostensibly be expanded to include a second plane and additional flights and destinations, requiring additional investments and commitments by Dream Pacific. In fact, however, from the beginning, Defendants Visconti, Finazzo and Lotter intended the expanded charter project to fail and to blame Dream Pacific for its failure.  They had no intention of XTRA performing the amended agreement, and deliberately failed to take several steps necessary to its success, including the provision of a second plane, the ETOPS certification of the first plane, and the securing of necessary government approval for the additional routes.

36.     On or about August 15, 2017, Dream Pacific and XTRA executed a document styled "Addendum 1."  Addendum 1 amended the original Aircraft Charter Agreement by providing for two aircraft rather than one, and by changing the schedule of charter flights to include three weekly flights between Saipan and each of four cities in China: Nanjing, Tianjin, Wuhan and Shenzhen.  Under Addendum 1, one plane would begin flying the Nanjing and Tianjin routes in late September 2017, while the second plane would begin flying the Shenzhen and Wuhan routes in late October 2017.  The minimum monthly hours were set at 230 hours per plane.

37.     Dream Pacific entered into Addendum 1 in good faith, intending to perform, and expecting XTRA to do the same.  XTRA, however, did not enter into Addendum 1 in good faith, but rather with fraudulent intent, and with the present intent not to perform its promises.

38.     In reliance on XTRA's good faith intent to fulfill its contractual obligations, and on the promises and representations of Defendants Visconti, Finazzo and Lotter, and with those Defendants' knowledge and/or reasonable expectation, the Business Plaintiffs associated and agreed with each other to arrange and provide for the entertainment, food and lodging of an anticipated average of 2,000 Chinese tourists per month to be transported to Saipan via XTRA Airways charter flights.  The Business Plaintiffs, and each of them, took actions, made plans, incurred expenses, and forewent other business opportunities in anticipation of and preparation for hosting these tourists.

39.     Also in reliance on the promises and representations of Defendants, and with Defendants' knowledge and/or reasonable expectation, Dream Pacific sold air tickets and travel packages to and from Saipan to the Tourist Plaintiffs, who in turn relied on the promises and representations of Defendants to purchase such air tickets and travel packages, and to take actions, make plans and incur expenses in anticipation of and preparation for their Saipan vacations.

## C.  The Plan Fails, as Defendants Intended.

40.     Charter flights on XTRA Airways between Saipan and China plan began in September 2017, and several round-trip flights took place in September and October 2017 between Saipan and Nanjing, and between Saipan and Tianjin.

41.     Rather than the agreed and anticipated two aircraft, however, XTRA supplied only one plane to provide service for charter flights: a twin-engine B737-800 passenger aircraft, with 186 passenger seats.  Defendants Visconti, Finazzo and Lotter, directly or through agents, continued to falsely represent to Dream Pacific that a second plane would be provided, even after, on

information and belief, the second aircraft that they had originally claimed was intended for the Saipan routes had been leased by XTRA to another company and was no longer available for Dream Pacific charters.

42.     Furthermore, even the single plane XTRA provided was not fit for its intended purpose. Twin-engine aircraft such as the plane provided by XTRA are prohibited by FAA "ETOPS" (extended-range twin-engine operations) regulations from flying over a route that contains a point further than one hour's flying time from an adequate airport, at the approved one-engine-inoperative cruise speed, unless the plane is ETOPS certified, which requires substantial aircraft modifications.  The route from the United States followed by the plane on its way to Saipan, as well as the planned routes between Saipan and China, includes substantial distances over the Pacific Ocean more than one hour's flying time from any adequate airport, but the plane provided by Defendants was not ETOPS certified.

43.     Defendants Visconti, Finazzo and Lotter, directly or through agents, represented to Dream Pacific that the planned routes between Saipan and China did not require its aircraft to be ETOPS certified because there was an adequate airport at Iwo Jima, but in fact Plaintiffs are informed and believe that the Iwo Jima airport, at all times relevant herein, was not an adequate airport for ETOPS purposes, due to its inadequate runway surface and length, lack of weather forecasting service, frequent closures, and other reasons.  Furthermore, on at least five occasions on which XTRA operated charter flights between Saipan and Nanjing – on September 24, September 29, October 8, October 13, October 27, 2017 – the airport at Iwo Jima was not in operation.

44.     In addition to the aforesaid ETOPS violations, XTRA operated its Saipan/China flights in violation of other CAAC and FAA safety regulations, including but not limited to regulations concerning duty times and crew rest requirements.  Defendants, including Defendant Conkling,

who piloted several of the flights on which violations took place, did not inform Plaintiffs of these violations, despite their prejudicial effect on the viability of the Saipan/China charter flight project.

45.     XTRA never flew the extra routes contemplated by Addendum 1, *i.e.*, the routes to and from Shenzhen and Wuhan.  Nor did XTRA ever obtain the government approval necessary to fly the Shenzhen and Wuhan routes. In fact, XTRA, unknown to Plaintiffs at the time, never even applied to either the Civil Aviation Administration of China (CAAC) or the U.S. Department of Transportation (DOT) for authorization to fly the routes between Saipan and Shenzhen or Wuhan, nor did they apply for or obtain permission from DOT for frequencies over 200 block hours per month.

46.     None of the Defendants ever informed Plaintiffs that the necessary applications to the CAAC and the DOT for authorization to fly the Shenzhen and Wuhan routes had never been made.   On the contrary, Defendants Visconti, Finazzo and Lotter continued to represent to Dream Pacific, falsely, that the application process for approval of those routes was underway.

47.     On or about September 24, 2017, the CAAC assessed eight demerits against XTRA Airways for its failure to satisfactorily address various permitting concerns under CAAC regulations. These demerits made it extremely unlikely that the CAAC would allow XTRA Airways to expand its operations from Nanjing and Tianjin to any other airports in China, including the airports in Shenzhen and Wuhan, even if it had sought such approval.  However, the Defendants who knew of these demerits and their likely effect did not inform Plaintiffs about them, but rather deliberately withheld this information from Plaintiffs.

48.     On November 4, 2017, XTRA advised Dream Pacific that its sole plane on Saipan had suffered a mechanical problem which required parts that could only be obtained in the mainland United States.  The passengers on the November 4, 2017, flight from Saipan to Tianjin had

already boarded the plane on Saipan expecting to return to China, but were deplaned at the Saipan airport due to this reported problem.

49.     XTRA had no second plane available for the deplaned passengers, or for the other Stranded Tourist Plaintiffs who were then present on Saipan and expecting to return to China in the next several days.   XTRA refused to feed, house, or otherwise accommodate the stranded tourists, including the Stranded Tourist Plaintiffs.   XTRA also refused to repatriate or pay for the repatriation of the stranded tourists back to China, forcing Dream Pacific to house, feed and repatriate them at Dream Pacific's expense.

50.     On or about November 10, 2017, after the plane was repaired, XTRA flew it back to the United States, declared the Aircraft Charter Agreement and Addendum 1 terminated, and provided no further charter services to or from Saipan.   Dream Pacific asked XTRA to resume air charter services, but XTRA refused to do so.

51.     As of November 10, 2017, approximately 2,000 intending tourists, including the Intending Tourist Plaintiffs, had signed up and paid to fly round trip from China to Saipan and back via XTRA Airways on various dates between November 10 and December 10, 2017, and all of their flights had to be cancelled.   Many of these passengers were coming to Saipan for weddings and vacation.   Defendants gave no advance notice to any of the intending tourists of the cancellation of these flights.

### C.  Defendants Wrongly Retain Dream Pacific's Funds.

52.     On September 11, 2017, Dream Pacific caused an additional "security deposit" in the amount of two hundred thousand dollars (US $200,000.00) to be wired to and deposited in XTRA's Wells Fargo Bank account in San Francisco, California.

53.     In or about September and October 2017, Defendants Visconti, Finazzo and Lotter, directly or through agents, represented to Dream Pacific that Dream Pacific needed to wire extra

deposit monies to cover XTRA's expenses in applying for authorization to fly between Saipan and Shenzhen and Wuhan.  Dream Pacific paid these deposits in reliance on this representation. This representation was false because XTRA was not making any such application.   This representation was made to defraud Dream Pacific.

54.     In reliance on the aforesaid misrepresentation, Dream Pacific caused the following monies to be wired from Hong Kong and Beijing and deposited into XTRA's account at the Wilmington Savings Fund Society in Wilmington, Delaware:

US $43,500 on October 25, 2017

US $39,800 on October 25, 2017

US $35,600 on October 25, 2017

US $42,800 on October 25, 2017

US $38,300 on October 25, 2017

US $42,900 on October 26, 2017

US $34,600 on October 26, 2017

US $43,200 on October 26, 2017

US $43,600 on October 26, 2017

55.     After XTRA flew its aircraft back to the United States and declared the Aircraft Charter Agreement terminated, Dream Pacific requested XTRA to refund the monies that Dream Pacific had wired, but XTRA refused to do so.

56.     XTRA also refused to pay the fees and deposits required for ground handling at the Nanjing Airport, in violation of its obligations under the Aircraft Charter Agreement, forcing Dream Pacific to pay Nanjing Airport authorities approximately US $100,000 for these expenses. XTRA also refused to pay LSG for supplying food and beverage for the charter service, as it was

required to under the Aircraft Charter Agreement, so Dream Pacific was forced to make these payments as well.

### D. Defendants' Actions Were Willful and Malicious

57.     Defendants' actions and omissions, as alleged herein, were willful, malicious, taken in bad faith for oppressive reasons, and evinced reckless disregard for human life and safety. Plaintiffs are therefore entitled to recover punitive damages from Defendants as to all claims asserted herein for which such damages are lawfully available.

### FIRST CAUSE OF ACTION:
### RICO
### (asserted by all Plaintiffs against all Defendants)

58.     The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

59.     At all times relevant to this action, Defendants, and each of them, were individuals or entities capable of holding a beneficial interest in property, and thus were "persons" within the meaning of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO"), 18 U.S.C. § 1961 *et seq*., including 18 U.S.C §§ 1961(3) and 1964(c).

60.     At all times relevant to this action, Defendants participated, combined and conspired with one another in unlawful conduct and illegal schemes as herein alleged.

61.     At all times relevant to this action, Defendants formed an association-in-fact for the purpose of defrauding Plaintiffs. This association-in-fact (hereinafter the "Enterprise") was an "enterprise" within the intent and meaning of RICO, 18 U.S.C. §1961(4).

62.     At all times relevant to this action, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the intent and meaning of RICO, 18 U.S.C. § 1926(c).

63.     At all times relevant to this action, Defendants were associated with the Enterprise, and conducted or participated in the conduct of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of RICO, 18 U.S.C. §1961(5), in violation of RICO, 18 U.S.C. § 1926(c).

64.     Defendants have, in participation, combination and conspiracy with one another, and through a pattern of racketeering activity and fraudulent and unlawful practices, defrauded Plaintiffs, who are corporations and individuals immediately engaged in the interstate and/or foreign commerce of the United States, with respect to their activities directly related to such commerce.  In so acting, Defendants have violated 18  U.S.C. §§ 1962(b), (c) and (d).

65.     Specifically, Defendants engaged in "racketeering activity" within the meaning of RICO, 18 U.S.C. § 1961(1), by engaging in the acts set forth above, which include, *inter alia*, devising a scheme to defraud, and for obtaining money by means of false representations and promises, and transmitting and causing writings, signs, signals and sounds to be transmitted by means of wire and/or radio communication in interstate and foreign commerce, for the purpose of executing such scheme, in violation of 18 U.S.C. § 1343, on numerous occasions, including but not limited to the wire money transfers of September and October 2017, which Defendants caused to be transmitted as alleged above, as well as numerous telephone calls and e-mails from Defendant Visconti and other XTRA personnel acting as the witting or unwitting agents of Defendants Visconi, Finazzo and Lotter, to Edmond Xia, Phil Nelson, and other Dream Pacific personnel, in August, September and October 2017, demanding, first, that Dream Pacific agree to Addendum 1, and then, after Addendum 1 was executed, making purportedly urgent demands for payment on multiple occasions. Plaintiffs are informed and believe that Defendants committed these acts willfully or with actual knowledge of the illegal activities.

66.    Plaintiffs allege upon information and belief that Defendants attempted to, conspired to, and did affect interstate and/or foreign commerce by the aforesaid acts of wire fraud in violation of 18 U.S.C. § 1343.

67.    Plaintiffs allege upon information and belief that Defendants' repeated violations of 18 U.S.C. § 1343 constituted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).  Plaintiffs allege upon information and belief that defendants' unlawful conduct as alleged herein, including Defendants' violations of 18 U.S.C. § 1343, injured Plaintiffs in their business and/or property, because these acts caused Plaintiffs to enter into contracts, transfer funds, make purchases, take actions, make plans, incur expenses and obligations, forego business opportunities, and otherwise sustain damages in an amount that will be proven at trial.

68.    In addition to any other damages to which they may lawfully be entitled, Plaintiffs are entitled to recover from Defendants threefold the damages they have sustained, and the cost of the suit, including a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c)(3).

## SECOND CAUSE OF ACTION:
### FRAUD
**(asserted by all Plaintiffs against all Defendants)**

69.    The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

70.    By and through their material misrepresentations and material omissions as set forth above, Defendants perpetrated fraud against Plaintiffs, causing them to suffer substantial economic damages. The material false representations and material omissions made by the Defendants were knowingly false and deceptive when made, and were intended to, and did, induce Plaintiffs to enter into contracts, including Addendum 1, transfer funds, make purchases, take actions, make plans, incur expenses and obligations, forego business opportunities, and to take other actions which proximately caused damages to Plaintiffs.

18

71.     Plaintiffs, acting in good faith, reasonably relied upon the material representations of Defendants relating to, *inter alia*, XTRA's intention to perform Addendum 1, XTRA's intention and ability to fly its scheduled and ticketed routes between Saipan and China; the number of aircraft available and intended for use, including substitute aircraft in cases of necessity; XTRA's ability to accommodate the volume of traffic contemplated and anticipated in the Aircraft Charter Agreement and Addendum 1; the lawful ability of the charters to fly to and from China without any ETOPS or other violations which could endanger passengers; the necessity of ETOPS certification for the planes and routes proposed to be used; XTRA's intention and ability to expand charter service to four Chinese cities, including Shenzhen and Wuhan; and the use and refundability of deposits paid to XTRA.

72.     Defendants did pursue certain acts and conduct as alleged above to accomplish the above unlawful scheme.  In so doing, Defendants made false and fraudulent representations to Plaintiffs as to material facts and information, and, further, made statements in which they intentionally and willfully failed to disclose material facts and information for the purpose of misleading Plaintiffs.

73.     Plaintiffs were  not knowledgeable as to the true facts and information which Defendants willfully concealed.

74.     Plaintiffs reasonably relied on the false and misleading information, as Defendants intended, and, as a direct and proximate result thereof, were and continue to be injured as more fully alleged herein.

### THIRD CAUSE OF ACTION:
### CONSUMER PROTECTION / UNFAIR COMPETITION
**(asserted by all Plaintiffs against all Defendants)**

75.     The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

76.     Defendants' above-described conduct involved the use of deceptive methods, acts and practices, and was unlawful, unfair and/or fraudulent in violation of the CNMI Consumer Protection Act, 4 CMC § 5100, *et seq.*

77.     In addition, and in particular, Defendants' conduct as aforesaid -

      a)  caused the likelihood of confusion or of misunderstanding as to the approval or certification of XTRA's air charter services, in violation of 4 CMC §§ 5105(c), (e) and (l);

      b)  represented that XTRA's air charter services had sponsorship, approval, characteristics and benefits that they did not have, in violation of 4 CMC § 5105(e);

      c)  represented that XTRA's air charter services were of a particular standard, quality or grade that the services did not meet, in violation of 4 CMC § 5105(g);

      d)  represented that XTRA's plane and air charter services were fit for a particular purpose when they were not, in violation of 4 CMC §5105(o);

      e)  introduced into commerce an unsafe aircraft which Defendants knew or should have known was unsafe, and performed a service causing unsafe conditions, in violation of 4 CMC § 5105(r);

      f)  inserted unconscionable provisions into the Aircraft Charter Agreement and Addendum 1, in violation of 4 CMC § 5105(gg).

78.     Plaintiffs were aggrieved and damaged by Defendants' conduct as aforesaid, in an amount to be proven at trial, are entitled to those damages and, as liquidated damages, an amount equal to their actual damages, as well as costs and reasonable attorney fees pursuant to 4 CMC § 5112.

79.     The Tourist Plaintiffs are informed and believe that approximately 2200 persons exist who are similarly situated to themselves (*i.e.*, persons who held tickets on XTRA Airways for flights to and/or from Saipan in November and December 2017, and whose flights were canceled due to XTRA Airways' abandonment of its Saipan routes) and may seek to constitute a class together with such persons pursuant to 4 CMC § 5112(b).

**FOURTH CAUSE OF ACTION:**
**NEGLIGENCE**
**(asserted by all Plaintiffs against all Defendants)**

80.     The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

81.     Defendants owed a duty to Plaintiffs to exercise reasonable care in the operation of air charter services and in the performance of the Aircraft Charter Agreement and Addendum 1.

82.     Defendants breached their duty of care by, *inter alia,* failing to make a sufficient number of aircraft available for use, including substitute aircraft in cases of necessity; failing to provide ETOPS-certified aircraft capable of safely and lawfully flying the intended routes; failing to take the necessary steps to secure approval to fly into and out of Shenzhen and Wuhan; failing to inform Plaintiffs of the failure to seek or obtain such approval, or to inform them of unsafe and unsound aviation practices being persistently and systematically carried on; abandoning ticketed passengers on Saipan without any accommodation or any means of return to China; and abandoning air service to Saipan altogether without notice and without any good or sufficient cause.

83.     Defendants' aforesaid conduct was grossly negligent, in that Defendants intentionally failed to perform multiple manifest duties in reckless disregard of the consequences as affecting the property of Business Plaintiffs and the lives and property of the Tourist Plaintiffs.

84.    Defendants' aforesaid acts of gross negligence proximately caused damages to Plaintiffs, who were distressed, burdened, forced to take actions, make plans, incur expenses and obligations, forego business opportunities, and incur other damages, all in an amount to be proved at trial.

### FIFTH CAUSE OF ACTION:
### BREACH OF CONTRACT / INTERFERENCE WITH CONTRACT
### (asserted by Dream Pacific against all Defendants)

85.    The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

86.    Dream Pacific at all times fulfilled its obligations under the Aircraft Charter Agreement and Addendum 1.

87.    XTRA breached the Aircraft Charter Agreement and Addendum 1 by

a.    failing to undertake all commercially reasonable efforts to return their aircraft to serviceable condition after it had mechanical problems in November, 2017;

b.    failing to provides a substitute aircraft when the last November charter was delayed beyond 48 hours;

c.    failing to make application for authorization to provide charter services to Wuhan and Shenzhen;

d.    incurring CAAC demerits which prejudiced its ability to obtain authorization to expand its charter service after September 29, 2017, to other destinations in China;

e.    endangering passengers and crew in violating ETOPS rules and regulations for several flights in September and October, 2017;

f.    refusing to return Dream Pacific's escrow deposits after terminating its services;

g.    failing to have its aircraft maintained, operated, qualified or fit for the commercial airlines operations undertaken under the Aircraft Charter Agreement;

h.      failing to arrange and manage the operation costs at the Nanjing Airport which forced Dream Pacific to do so;

i.      failing to apply for and/or use commercially reasonable efforts to obtain authorization and permits needed from governmental authorities in China necessary for XTRA Airways to perform the transportation services required under the Aircraft Charter Agreement;

j.      failing to accommodate the passengers on the terminated November 4, 2017, flight, and other Stranded Tourists, by housing or feeding them on Saipan or by taking any action to repatriate them back to China or reimburse Dream Pacific for its expenses in housing, feeding and transporting these passengers back to China;

k.      endangering passengers and crew by overworking aircraft crews beyond time limits required by law;

l.      failing to supply more than one aircraft;

m.      failing to give the statutorily required notices of flight cancellation, as required by 14 CFR § 380.27;

88.    XTRA also breached the implied covenant of good faith and fair dealing that is inherent in every contract, by reasons of its fraudulent and deceptive conduct as set forth herein.

89.    The other Defendants combined and colluded with XTRA to procure and accomplish the breaches of contract alleged herein.

90.    These breaches of the contract damaged Dream Pacific in an amount to be proven at trial, an amount in excess of ten million dollars (US $10,000,000.00).

//

//

### SIXTH CAUSE OF ACTION:
### UNJUST ENRICHMENT
#### (asserted by Dream Pacific against all Defendants)

91.     The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

92.     Dream Pacific paid at least US $1.6 million to XTRA. These funds were misappropriated by XTRA, pursuant to and in furtherance of the conspiracy alleged herein, and, based upon information and belief, have been used by XTRA for its own purposes.

93.     The misappropriation and use of these funds constitutes unjust enrichment at Dream Pacific's expense.

94.     Dream Pacific is entitled to restitution of the misappropriated funds.

### SEVENTH CAUSE OF ACTION:
### CONVERSION
#### (asserted by Dream Pacific against all Defendants)

95.     The allegations in all the preceding and subsequent paragraphs of this Complaint are repeated, re-alleged and incorporated here by reference, as if fully here set forth herein.

96.     Dream Pacific paid at least US $1.6 million to XTRA into escrow accounts as security deposits to be held by XTRA and returned to Dream Pacific.  XTRA, pursuant to and in furtherance of the conspiracy alleged herein, has failed and refused to return those deposits, and, based upon information and belief, has instead unlawfully converted them to its own use, contrary to their intended purpose.

97.     This conversion was unlawful and unauthorized, and these funds should be returned either to Dream Pacific and/or their escrow account.

98.     As a result of this conversion, Dream Pacific has been damaged in an amount in excess of US $1.6 million.

WHEREFORE, Plaintiffs pray the Court for the following relief:

1.      Compensatory damages, including damages for emotional distress;

2.      Lost profits;

3.      Other incidental and consequential damages;

4.      Liquidated damages;

5.      Special damages in an amount to be proven at trial;

6.      Rescission of Addendum 1;

7.      Disgorgement of ill-gotten gains in an amount to be proven at trial;

8.      Restitution in an amount to be proven at trial;

9.      Imposition of a constructive trust as to all ill-gotten gains;

10.     Punitive damages in the amount of US $50,000,000.00;

10.     Attorney fees in an amount to be proven at trial;

11.     Costs of this action in an amount to be proven; and

12.     For such other and further relief as this Court deems just and proper.

Respectfully submitted this fourth day of April, 2018.

O'CONNOR BERMAN HOREY & BANES, LLC
*Attorneys for Plaintiffs*


*/s/ Robert J. O'Connor*
By: _____
ROBERT J. O'CONNOR, ESQ.